**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHAEL JOSEPH MEADE. | No. 3:26-cr-64-1 (OAW) |

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Michael Joseph Meade, along with co-defendant Chet Lee West, was charged in a 20-count indictment with various tax-related crimes. Mr. Meade, specifically, was indicted for: Tax Evasion, in violation of 26 U.S.C. § 7201; Conspiracy to Obstruct and Defeat the Internal Revenue Service, in violation of 18 U.S.C. § 371; Attempts to Interfere with the Administration of the Internal Revenue Service ("IRS"), in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2; Aiding or Assisting Filing of False Documents in violation of 26 U.S.C. § 7206(2) and 18 U.S.C. § 2; and Failure to File Tax Return, in violation of 26 U.S.C. § 7203. ECF No. 1. On September 10, 2026, Mr. Meade moved to suppress evidence gathered from a pole camera outside his house, which he argues was installed without a search warrant, and infringed upon his reasonable expectation of privacy. ECF No. 107. The government filed its opposition on September 24, 2026. ECF No. 110. For the below reasons, the motion hereby is **DENIED**.

## I. BACKGROUND

Mr. Meade moved to suppress all video evidence obtained by a pole camera which was installed by IRS Criminal Investigations Division ("IRS-CID") Special Agents in collaboration with the Connecticut State Police. The camera was installed on a utility pole on Maynard Road, which is not the street on which Mr. Meade resides. As shown by the still image below, the pole camera captured "the curtilage and area immediately adjoining Mr. Meade's garage." ECF No. 107-1 at 1–2.




The camera provided "uninterrupted video surveillance," ECF No. 107-1 at 1, of "a portion of the exterior of [Mr. Meade's] home, [ ] driveway, and vehicles, including a Mercedes, a truck, and at times a motorcycle," ECF No. 110 at 5, and while IRS-CID investigators "could remotely tilt, pan, and zoom the camera," *id.* at 4–5, it "did not [peer] over any fences . . . nor . . . look into any windows," and it "lacked a light source or any 'advanced capabilities' (*e.g.,* facial recognition, heat sensing technology, or 'night vision')," *id.* at 4. The pole camera footage was "used, to some extent, in connection with planning the logistics related to Mr. Meade's arrest," such as "in establishing if there were any guard dogs or other potential risks to officer safety in connection with the . . . planned

arrest," *id.* at 5, and Meade does not appear to describe in any more detail the nature or the value of the footage he wishes to suppress. In fact, "The day after Meade was arrested . . . , the camera was no longer used by investigators or positioned to observe his property or driveway or luxury vehicles, and was turned off and no longer recording. . . ." *Id*.

The camera recorded 24 hours a day and its time- and date-stamped video footage was stored so that IRS-CID investigators could review it later. *Id*. The pole camera was installed on February 19, 2026, and the video recording began the next day, stopping on April 23, 2026, some 62 days later, after Mr. Meade was arrested. *Id.*

Mr. Meade has moved to suppress the pole camera evidence, asserting that the pole camera constituted a search, that it violated his reasonable expectation of privacy, and that the court "should decline to find an exception to the exclusionary rule." ECF No. 107-1 at 1–2.

## II. DISCUSSION

### A. Search Under Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* Therefore, the relevant question is whether there was a "search" within the meaning of the Fourth Amendment, as "a court

may exclude evidence that has been searched or seized in violation of the Fourth Amendment." *United States v. Salaman*, 742 F. Supp. 3d 221, 228 (D. Conn. 2024).

"Warrantless searches are ordinarily *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Harry*, 130 F.4th 342, 347 (2d Cir. 2025) (citation modified). However, "not all law enforcement-initiated surveillance qualifies as a search." *Id.* (citation modified). A search occurs only if the target has a "reasonable expectation of privacy in the area searched." *Id.* (citation modified). To determine whether the target had a reasonable expectation of privacy, courts apply a two-part test involving both a subjective and an objective element: (1) "has the individual manifested a subjective expectation of privacy in the object of the challenged search, and (2) is society willing to recognize that expectation as reasonable?" *Id.* (citation modified).

Regarding pole cameras, specifically, the United States Court of Appeals for the Second Circuit has held that "the use of a stationary pole camera," as deployed "to monitor the publicly visible exterior of a target's business for a period of 50 days" does not constitute a search under the Fourth Amendment, *Harry*, 130 F.4th at 348, even though it might "occasionally" capture "the interior of the business' garage bay whenever the garage door [is] raised," *id.* at 345. Accordingly, in *Harry*, the Second Circuit affirmed the trial court's denial of suppression, after which the government introduced "28 minutes' worth of footage at trial, which showed [the defendant and others] transferring bags of what the government adduced to be controlled substances to their vehicles." *Id.* at 346, 352.

Here, Meade does not offer any subjective actions he took to conceal his activity in the open areas captured by the pole camera (without navigating around any fence or wall). Therefore, the court can find no subjective expectation of privacy in this case. And while, objectively, people may enjoy a "heightened expectation of privacy **in the home**," *see United States v. McKenzie*, 13 F.4th 223, 232 (2d Cir. 2021) (emphasis in original), this expectation of privacy "is not extended to the open fields," *Hester v. United States*, 265 U.S. 57, 59 (1924). However, it *does* extend to a home's curtilage so as to protect against manipulation of a tarp covering a vehicle parked in a driveway, *see Collins v. Virginia*, 584 U.S. 586 (2018). Nevertheless, the present case involved no such physical intrusion onto the defendant's driveway, manipulation of any of his property, or view of any areas protected from public view.

"Nearly every circuit to have passed on the question has held that pole cameras do not constitute a search within the meaning of the Fourth Amendment." *Harry*, 130 F.4th at 347–48 (citing cases from the Fourth, Fifth, Sixth, Seventh, and Tenth Circuits). The First Circuit affirmed pole camera usage, "with the panel evenly split on whether there was no search at all or whether there was one that the Fourth Amendment's good-faith exception excused." *Id.* And the Second Circuit has held that surveillance of "the ***interior*** of [someone's] home and . . . curtilage" for "almost three months" did not violate the Fourth Amendment. *See Borg v. Town of Wesport*, 685 Fed. Appx. 10, 10–11 (2d Cir. 2017) (summary order) (emphasis added). In reaching that conclusion, the court relied on precedent establishing that "what a person knowingly exposes to the public through an open door or window does not receive Fourth Amendment protection." *Id.* at 11.[1]

[1] Still, the court held that such recordings could not "be used 'to explore the details of the home that would previously have been unknowable without physical intrusion.'" *Id.*

And again, the present defendant does not claim that the pole camera intruded upon a bedroom, bathroom, or outdoor shower; he does not claim that it zoomed in to see through a keyhole or in between the spaces of shut blinds. In fact, he only seeks to exclude the apparent footage of "activities ***outside*** Mr. Meade's residence," ECF No. 107 at 1 (emphasis added), at the home's "***curtilage*** and the areas immediately ***adjoining*** his home," ECF No. 107-1 at 1 (emphasis added). On the facts as presented, the court cannot find that Mr. Meade enjoyed any reasonable expectation of privacy in those spaces, and thus the court finds that no search was conducted here.

The court does acknowledge, though, that it has been held within this district that "the government conducts a 'search' when it uses a pole camera to conduct prolonged and targeted video surveillance of the outside of a person's home." *Salaman*, 742 F. Supp. 3d at 231. In reaching this conclusion, the *Salaman* court relied on *Carpenter v. United States*, 585 U.S. 296 (2018), wherein the Supreme Court of the United States held that the government "invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements," when it subpoenaed a person's cellular phone company to obtain records which showed the person's historical location information over seven or more days. *Salaman*, 742 F. Supp. 3d at 230. The *Salaman* court noted that, while a pole camera "does not expose intimacies inside the home," it did "burden[] a person's right to retreat to their home if the government tracks their every entry and exit as well as all others whom they may invite to their home." *Id.* at 231. The court ultimately declined to exclude the evidence, however, holding that "an objectively reasonable law enforcement officer within the Second Circuit would believe that they need not apply for

a search warrant before installing and using a pole camera to engage in prolonged surveillance of the outside of a person's home." *Id.* at 231–32.

Here, as the government points out, Mr. Meade unquestionably knew that the outside of his home was visible to the public, as there was no fence or other barrier blocking the public from viewing his home. ECF No. 110 at 12–13. And precedent establishes that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). While there is no "reasonable expectation of privacy . . . in what is left visible to the naked eye," *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000), the fact that a pole camera can continuously record for 62 days appears undoubtedly different than a law enforcement officer's naked eye view, which cannot zoom, pan, or store footage for perpetual review, *Salaman*, 742 F. Supp. 3d at 230–31. However, even presuming that the government conducted a search by using the pole camera to "conduct [a] prolonged" video surveillance of the outside of Mr. Meade's home, *id.* at 231, for the reasons below, the pole camera footage is not subject to the exclusionary rule.

**B. <u>Exclusionary Rule</u>**

"[N]ot every violation of the Fourth Amendment justifies invocation of the exclusionary rule to require suppression of evidence." *United States v. Smith*, 967 F.3d 198, 211 (2d Cir. 2020). The exclusionary rule "is a judicially-created mechanism of safeguarding against unreasonable searches and seizures—violations of the Fourth Amendment—primarily through its deterrent effect." *Id.* (citing *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020)). "[T]he exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a

constitutional violation is the product of recurring or systemic negligence." *Id.* "[I]f the police have otherwise acted mistakenly, but in objective good faith that they have not violated the Fourth Amendment, then the remedy of suppression is not appropriate." *Salaman*, 742 F. Supp. 3d at 231. In other words, the good-faith inquiry is limited to the objective question as to "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Smith*, 967 F.3d at 212.

Even presuming the warrantless use of the pole camera was a search, "at least as the landscape lies now, an objectively reasonable law enforcement officer within the Second Circuit would believe that they need not apply for a search warrant before installing and using a pole camera to engage in prolonged surveillance of the outside of a person's home." *Salaman*, 742 F. Supp. 3d at 231–22 (citing cases). In at least two cases, the Second Circuit has held that use of a pole camera did not constitute a search (once, when used to monitor the publicly-visible exterior of a target's business; the other, to monitor the target's residence), and even in *Salaman*, where this court held that the use of a pole camera was a search, the court declined to exclude the pole camera video. *See Harry*, 130 F.4th at 348 (finding use of pole camera to monitor business was not a search); *Borg*, 685 Fed. Appx. at 10–11 (finding use of pole camera to monitor private residence was not a search); *Salaman*, 742 F. Supp. 3d at 231–22 (finding use of a pole camera to monitor private residence was a search but declining to exclude evidence). Accordingly, it was objectively reasonable for law enforcement in this circuit to believe that they need not apply for a search warrant before installing a pole camera, and Mr. Meade's motion to suppress the pole camera evidence is denied.

Regardless, it is unclear what impact (if any at all) this ruling would have on the trial of this case, as Mr. Meade has not expressed the nature of the activity captured by the pole camera, and the government has not indicated whether (or for what purpose) it intends to introduce such evidence at trial. Indeed, the government represented that the footage was used, at least "to some extent," for "planning the logistics related to Mr. Meade's arrest," and to assess "potential risks to officer safety" such as by determining whether Mr. Meade owned "any guard dogs." ECF No. 110 at 5.

The court would posit that cases (like this one) alleging financial crimes often differ from prosecutions of suspected drug distribution, wherein video surveillance might catch hand-to-hand drug transactions, or the transportation of large shipments of drugs or cash. But whatever Mr. Meade might have been doing within view of the pole camera (whether retrieving the newspaper in his bath robe or sunbathing in his driveway), he ***would not*** have been enjoying a reasonable expectation of privacy under the current state of the law (as creepy as that might seem), just as the teacher who rushes to the grocery store in their weekend sweatsuit risks bumping into a student while feeling underdressed in public. And even if the pole camera usage would have amounted to a search in this case, it would not have been one which would have required exclusion of its captured footage. *See Salaman*, 742 F. Supp. 3d at 232 (noting, while declining to apply the exclusionary rule, "From more than ten years as a federal judge, I know that law enforcement very frequently installs pole cameras outside the homes of suspects who are under investigation and that they do so without first applying for a search warrant. Although there is no published decision of the Second Circuit or the Supreme Court that explicitly addresses and

authorizes the warrantless installation and use of pole cameras, most cases . . . hold that a warrant is not required.") (*Hon. Jeffrey Alker Meyer, USDJ*). This undersigned agrees.

## III. CONCLUSION

For the forgoing reasons, Mr. Meade's motion to suppress is **DENIED.**

**IT IS SO ORDERED** at Hartford, Connecticut, this 9th day of November, 2026.

/s/
Omar A. Williams
United States District Judge